**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| THE OILGEAR COMPANY, OLMSTED PRODUCTS COMPANY LLC<br>*Plaintiffs*<br><br>v.<br><br>TENET HYDRAULICS CO., SMITH PROPERTY INVESTMENTS, LLC, DERRICK MARRANCA, JESSE KLINE, and DUDLEY SMITH<br>*Defendants.* | Civil Action No.: |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs The Oilgear Company ("Oilgear") and Olmsted Products Company LLC ("Olmsted") allege against Defendants Tenet Hydraulics Co. ("Tenet"), Smith Property Investments, LLC ("SPI"), Derrick Marranca ("Marranca"), Jesse Kline ("Kline"), and Dudley Smith ("Smith") (collectively, the "Defendants") as follows:

### I.     NATURE OF THE ACTION

1.     Oilgear manufactures and services hydraulic valves. Relevant to this action, Oilgear generates a significant percentage of its total revenues from the manufacturing and servicing of motion compensation valves (also known as "Olmsted" valves). Oilgear developed its Olmsted valve business by acquiring Olmsted in November 2008. Olmsted continues to operate as a subsidiary of Oilgear.[1]

2.     Smith was once the President and owner of Olmsted and became an Oilgear employee after the Olmsted acquisition. Although his employment with Oilgear ended in 2010, Smith worked for Oilgear as a consultant at various times since then.

---

[1] Olmsted is a wholly-owned subsidiary of Oilgear. Accordingly, other than references to Oilgear's acquisition of Olmsted, both Olmsted and Oilgear are frequently referred to jointly as "Oilgear" throughout this Complaint.

3.      Kline is also a former Olmsted and Oilgear employee. In 2018, Kline resigned from Oilgear and told Oilgear that his next job would be fabricating automotive parts. That was not true. Immediately after Kline left Oilgear, he and Smith formed Tenet and began soliciting Oilgear customers.

4.      Tenet is nothing but an attempt to create an Olmsted duplicate by stealing and misappropriating Olmsted's trade secrets. For example, and most recently, Derrick Marranca resigned from Oilgear to join Tenet and took with him an external hard drive to which he had downloaded what appears to be every bit of networked data that he could access related to Oilgear's Olmsted subsidiary. Specifically, Marranca kept—and failed to disclose to Oilgear—an external hard drive containing approximately 38,400 Oilgear files (51.4 gigabytes of data). Among these files were detailed engineering drawings, customer pricing information, detailed testing procedures, and virtually any other document that would be needed for someone to create a carbon copy of Oilgear's entire motion compensation valve business. Countless of these files contain the following disclaimer:

THE INFORMATION CONTAINED HEREIN CONSTITUTES PROPRIETARY CONFIDENTIAL AND TRADE SECRET INFORMATION OF OLMSTED PRODUCTS CO. AND IS TO BE ACCEPTED SUBJECT TO THAT UNDERSTANDING. IT IS TO BE KEPT CONFIDENTIAL AND NOT BE COPIED, USED, OR CONVEYED TO OTHERS WITHOUT OLMSTED PRODUCTS CO.'S WRITTEN AUTHORIZATION.

5.      Tenet is believed to be using the stolen information to replicate Oilgear's services and pricing and to solicit and convert Oilgear's long-term customers. Through their actions, including the misappropriation of Oilgear's confidential and proprietary information, Defendants are attempting to convert the substantial business that was developed by Oilgear over many years in to Tenet's newly-created business.

6.      Because Oilgear believes that Smith, Tenet, Kline, and Marranca continue to possess Oilgear trade secrets, Oilgear files this suit, seeking both damages and injunctive relief requiring Smith, Tenet, Kline and Marranca to return Oilgear property and cease the misappropriation of any Oilgear

trade secrets. A motion seeking expedited discovery and a motion for preliminary injunction are being filed contemporaneously with this Complaint.

## II.    PARTIES

7.     Plaintiff Oilgear Company is a corporation organized under the laws of Wisconsin with its principal place of business in Traverse City, Michigan.

8.     Plaintiff Olmsted Products Company LLC is a limited liability corporation formed under the laws of Wisconsin with its principal place of business in Traverse City, Michigan.

9.     Defendant Tenet Hydraulics, Inc. is a corporation organized under the laws of Michigan with its principal place of business in Traverse City, Michigan. Tenet may be served through its registered agent, Dudley Smith, at 1564 Northern Star Drive, Traverse City, MI 49686.

10.     Defendant Smith Property Investments, LLC is a limited liability company that is wholly-owned, managed and controlled by Dudley Smith. SPI may be served through its registered agent, Dudley Smith, at 125 East Front Street, Suite 204, Traverse City, Michigan 29684.

11.     Oilgear is informed and believes and, therefore, alleges that Defendant Derrick Marranca is an individual residing in Interlochen, Michigan. He may be served at 20682 Honor Hwy, Interlochen, MI 49643, or wherever else he may be found.

12.     Oilgear is informed and believes and, therefore, alleges that Defendant Jesse Kline is an individual residing at 8769 E 20 1/2 Road, Manton, MI 49663. He may be served there or wherever else he may be found.

13.     Oilgear is informed and believes, and therefore, alleges that Defendant Dudley Smith is an individual residing at 6168 Peninsula Drive, Traverse City, MI 49686. He may be served there or wherever else he may be found.

## III.   JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Oilgear's federal trade secret claim pursuant to 18 U.S.C. § 1836 *et seq*. and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because the parties reside in this District, do business in this District, and a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.

16.    A substantial part of the events giving rise to the claims alleged in this Complaint occurred in Grand Traverse County, Michigan. Accordingly, this action is properly filed in the Northern Division of this Court.

## IV.   FACTS

### A.   Relevant History of Oilgear and its Business

17.    Oilgear manufactures and services hydraulic control products and systems. It develops, builds, sells, and services cutting-edge hydraulic valve technology across numerous industries. Relevant to this action, Oilgear is a worldwide leader in the design and manufacturing of motion compensation valves (also known in the industry as Olmsted valves).

18.    While motion compensation valves may be used in a variety of applications, they are primarily utilized on deepwater oil drilling rigs that need to contend with the motion of the ocean. Oilgear's motion compensation valves allow drilling strings to maintain a vertical position even as waves impact or move the drilling vessel. Oilgear's motion compensation valves are made more complicated (and valuable) by their ability to sense and almost instantaneously react to loss-of-load events such as when a drill component breaks.

19.    Oilgear became a leader in motion compensation valves through its acquisition of Olmsted in November 2008. At that time, Smith was the owner and President of Olmsted. In

connection with Oilgear's acquisition of Olmsted, Smith, as "Shareholder," executed an Asset

Purchase Agreement ("APA") providing:

> 5.8    Confidential Information
>
> (a)    Nondisclosure. Company and Shareholder shall maintain all Confidential
> Information in strict confidence, and secrecy, and shall not, at any time subsequent to
> the Closing, directly or indirectly, (i) use any Confidential Information for any purpose,
> (ii) disclose any Confidential Information to any person or entity other than Buyer, (iii)
> keep or make copies of any documents, records or property of any nature whatsoever
> containing any Confidential Information or (iv) assist any other person or entity in
> engaging in any of the foregoing, except to the extent necessary to comply with the
> express terms of any written agreement between Company or Shareholder and Buyer
> and except to the extent explicitly requested in writing by Buyer.

20.    Confidential Information is defined in the APA as:

> "all ideas, information, knowledge and discoveries, whether or not patentable,
> trademarkable or copyrightable, that are not generally known in the trade or
> industry and about which Company or any Shareholder has knowledge as a
> result of its, his or her participation in, or direct or indirect beneficial
> ownership of, the Business, including product specifications, manufacturing
> procedures, methods, equipment, compositions, technology, patents, know-
> how, inventions, improvements, designs, business plans, marketing plans, cost
> and pricing information, internal memoranda, formula, development
> programs, sales methods, customer, supplier, sales representative, distributor
> and licensee lists, mailing lists, customer usages and requirements, computer
> programs, information constituting "trade secrets" under applicable Law and
> other confidential technical or business information and data.

21.    After Oilgear's acquisition of Olmsted, Smith remained an Oilgear employee until

November 2010.

22.    On July 30, 2012, Smith, through his company DMO Properties, LLC (now known

as SPI), and Olmsted entered into a lease agreement whereby Smith leased Olmsted the property at

1424 International Drive, Traverse City, Michigan, Unit 9. The lease includes a Quiet Enjoyment

provision:

> Landlord agrees that at all times when Tenant is not in default under the provisions
> and during the Term of this Lease, Tenant's quiet and peaceable enjoyment of the
> Premises will not be disturbed or interfered with by Landlord or any person claiming
> by, through, or under Landlord

19.     Olmsted continues to rent the Traverse City property from Smith under the terms of the aforementioned lease, though unrelated provisions were amended on December 1, 2014.

**B.     Former Oilgear Employees Systematically Have Attempted to Deceive Oilgear and Abscond with Oilgear Trade Secrets**

**1.     Jesse Kline**

23.     Jesse Kline was an Olmsted employee prior to Oilgear's acquisition of Olmsted in November 2008. From the date of the acquisition to September 11, 2018, Oilgear employed Kline as a Strategic Account Manager for the Olmsted subsidiary. As Kline's former job title implies, Kline's primary responsibility for Oilgear was to develop and retain strategic accounts, namely those involving Olmsted motion compensation valves.

24.     On or about June 13, 2018, Kline copied voluminous business information from his Oilgear laptop computer to an external hard drive. The data transfer to the external hard drive included over 700 Oilgear files, ranging from pricing quotes to design drawings to contact lists. Kline's copying of Oilgear data was unknown to Oilgear at that time and was not authorized.

25.     On August 21, 2018, Kline announced his resignation from Oilgear. Kline informed Oilgear that he was going to work for a machine and fabrication shop focused on automotive vehicles. This was an intentionally false statement. Kline had already made plans to work with Smith and Tenet.

26.     Kline's last day of employment with Oilgear was September 11, 2018. He was asked to return all Oilgear property at that time, and he turned in his Oilgear laptop, along with the external hard drive containing vast quantities of Oilgear data. Oilgear is without knowledge as to whether Kline transferred data from that hard drive to any non-Oilgear devices before returning it on or about September 11.

27.     Shortly after departing Oilgear under false pretenses, Kline traveled to Norway and accompanied Jeffrey Insch ("Insch") to a client pitch on behalf of Tenet occurring on or about October 24, 2018.

28.     On information and belief, during that Norway trip, Kline called on the same customers served by Oilgear for the same services and/or products provided by Oilgear.

29.     Around the same time period, Kline contacted Oilgear employees to notify them that Tenet was interested in hiring them and asked that they not execute any agreements (such as non-compete agreements) with Oilgear.

**2.     Jeffrey Insch**

30.     Oilgear employed Insch as a Senior Project Manager based out of Traverse City from October 2009 to April 7, 2014. On April 7, 2014, Insch moved to the United Kingdom and continued working there for Oilgear as a Strategic Account Manager until October 12, 2018. As Strategic Account Manager, Insch was responsible for developing, training, and servicing distribution relationships for motion compensation valves in the United Kingdom and Scandinavia regions.

31.      On April 7, 2014, in a "Statement on Main Terms and Conditions of Employment" Insch agreed not to "disclose to any person or persons whatsoever (except the officers of the company or under the authority of the Managing Director) any confidential information relating to the business, technical processes or finances of the company, or to any customer of the company, information which may have come into [his] possession during [his] employment."

32.     On October 5, 2018, Insch advised Oilgear that he had received an employment offer with Tenet but had not decided to accept it. Insch stated his professed belief that Tenet would not directly compete with Oilgear's Olmsted subsidiary. Insch also informed Oilgear that Tenet, as a startup, would be slow in its initial operations because it lacked adequate testing and assembly equipment, and had no employees other than Kline and Smith. On information and belief, each of

the statements Insch made contained false representations and were offered to mislead Oilgear about Tenet's intentions and capabilities.

33.     In early October 2018, Insch transferred over 100 highly confidential Oilgear files from his Oilgear laptop to an external storage device. These files included Oilgear's proprietary business information, including engineering drawings specifically related to Oilgear's Olmsted valves. Insch does not deny that he downloaded and transferred these files, nor does he deny that they are highly confidential.

34.     On October 12, 2018, Insch announced that he was resigning from Oilgear with "immediate effect."

35.     On October 19, 2018, Insch appeared at Oilgear's office in Aberdeen, Scotland, with his two Company-issued laptop computers. In front of other employees, Insch purported to delete "personal" files from the computers. And Insch then purported to delete Oilgear materials from an external storage device. During this appearance, Insch represented to Oilgear that he was not in possession of any other Oilgear Confidential Information. Insch remained in possession of the external storage device from which he had just "deleted" Oilgear data and Oilgear alleges that not all Oilgear data was truly remediated from that device.

36.     On information and belief, on or about October 24, 2018, mere days after resigning, Insch accompanied Kline to attend customer pitch meetings in Norway on behalf of Tenet, calling on the same customers served by Oilgear.

37.     On October 31, 2018, Oilgear's counsel delivered correspondence to Insch requesting, among other things, full disclosure of Confidential Information in Insch's possession, as well as access to all sources of electronically stored information where such data may be stored and accessible to Insch. Contemporaneously, Oilgear also delivered correspondence to Tenet and Smith, asserting its belief that Tenet and its new employees and agents Kline and Insch had misappropriated Oilgear's

trade secrets, breached contractual obligations, and tortiously interfered with Oilgear's existing and prospective business relations.

38.     On November 5, 2018, Insch responded through counsel, stating that he had not commenced subsequent employment (with Tenet or otherwise) and had no start date for such employment. Insch denied retaining access to any Oilgear Confidential Information, denied disclosing Oilgear's confidential information to any third parties, denied soliciting Oilgear's customers, and denied having any intention to solicit Oilgear's customers.

39.     On November 16, 2018, Tenet and Smith, through counsel, separately responded to Oilgear's October 31, 2018 letter. They stated that Insch was "not employed by or otherwise engaged with Tenet" but conceded that Tenet "did offer Mr. Insch a job [and] his employment was terminated" for unspecified reasons. They further noted that "the job offer was also specifically conditioned on Mr. Insch's agreement that he would not bring any intellectual property, trade secret documentation, customer contact lists, or other similar information from any previous employer[.]" They also represented that "no one at Tenet possesses any Oilgear trade secret or proprietary information and directing the employees to never use any Oilgear trade secret or proprietary information on behalf of Tenet or anyone else." With respect to Kline, Tenet and Smith represented that "his employment offer was specifically conditioned on his agreement that he would not bring any intellectual property, trade secret documentation, customer contact lists, or other similar information from any previous employer[,]" and further that Tenet gave Kline an "an unequivocal directive that he is not to use or disclose any confidential Oilgear business information."

40.     On January 25, 2019, Insch, on behalf of Tenet, visited an Oilgear customer.

41.     On or about February 4, 2019, Insch filed a "Certificate of Incorporation of Private Limited Company" with the Scotland Registrar of Companies on behalf of an entity named "Tenet

Hydraulics (Europe) Ltd." Insch and his spouse, Gail Insch, are listed as the two initial shareholders of this Scottish limited company.

### 3.    Derrick Marranca

42.    Oilgear employed Derrick Marranca ("Marranca") as a Field Service Technician between February 20, 2012 and May 24, 2019. As a Field Service Technician, Marranca serviced and repaired customers' operating motion compensation valves on offshore oil platforms throughout the world. Marranca's ability to serve Oilgear's customer needs relied, in substantial part, on his having access to Oilgear's confidential and proprietary information.

43.    Marranca announced his resignation from Oilgear on May 24, 2019, which was also Marranca's last day of employment.

44.    On May 23, 2019—the day before Marranca announced his resignation—Marranca copied over 4,500 Oilgear files from Oilgear's computer network onto an external hard drive that Marranca owned. These files included customer quotes, service details, customer invoices, and detailed procedures for testing and troubleshooting Oilgear components. Many of the files that Marranca copied to his personal hard drive the day before his departure contain the following disclaimer at the top of the document:

The information contained herein constitutes proprietary confidential and trade secret information of Oilgear Co.; and is to be accepted subject to that understanding.  It is to be kept confidential and not be copied, used, or conveyed to others without written authorization.

45.    Upon Marranca's departure, he did not inform Oilgear of his taking or possession of its Confidential Information. Oilgear only learned of Marranca's retention of Oilgear data through Oilgear's other employees, who expressed concern that Marranca would use such data to unfairly compete against Oilgear.

46.    On June 3, 2019, at 6:35 P.M. Eastern Time, Oilgear's General Manager, Michele Bublitz, contacted Marranca to inquire about the employee rumors that Marranca possessed a hard drive containing Oilgear data. Marranca denied having any such device. But Marranca did confess to

having other USB storage devices containing Oilgear data. Marranca claimed that he was working at an undisclosed job site and was either unable or unwilling to surrender the devices promptly for inspection. Bublitz directed Marranca not to use, tamper with, or alter the drives in any way until they could be reviewed by Oilgear.

47. On June 13, 2019, notwithstanding his prior denial, Marranca (through counsel) surrendered an external hard drive and six other USB storage devices to Oilgear's third-party forensic investigators. That forensic investigation produced evidence of troubling activities. Marranca's external hard drive contained roughly 38,400 Oilgear files, representing a staggering 51.4 gigabytes of data. Marranca had downloaded virtually every conceivable piece of Oilgear data that in any way related to its motion compensation business. Marranca's hard drive contained, among other highly confidential materials: detailed engineering specifications for Oilgear valves and parts, customer lists, detailed pricing estimates, service histories, part lists, and repair and servicing instructions for specific components. Most of these documents contain either the same disclaimer above, in Paragraph 44, or the following disclaimer specific to the Olmsted drawings:

THE INFORMATION CONTAINED HEREIN CONSTITUTES PROPRIETARY CONFIDENTIAL AND TRADE SECRET INFORMATION OF OLMSTED PRODUCTS CO. AND IS TO BE ACCEPTED SUBJECT TO THAT UNDERSTANDING. IT IS TO BE KEPT CONFIDENTIAL AND NOT BE COPIED, USED, OR CONVEYED TO OTHERS WITHOUT OLMSTED PRODUCTS CO.'S WRITTEN AUTHORIZATION.

48. Most troubling of all, forensic testing shows that at 5:25 A.M. Eastern Time, June 3, 2019—roughly 12 hours before Marranca spoke to Bublitz and denied possessing any hard drive with Oilgear data—Marranca had connected the external hard drive to an unidentified Windows-based computer. And then, at 6:32 P.M. Eastern Time on June 3, Marranca saved a new document on that external hard drive, entitled "Service timesheet 2.xlsx." That file is an exact duplicate of an Oilgear form found in the same folder on the external hard drive, but instead of Oilgear's name at the top, it contains Tenet's logo and Tenet's contact information. Worse yet, Marranca had populated the form

to reveal that he was on a job with a "Trip Start Date" of June 2, 2019, on behalf of "Noble." Noble Corporation is a significant customer of Oilgear's.

49.    It was <u>three minutes</u> after saving that Tenet duplicate of an Oilgear form onto the external hard drive containing 38,400 Oilgear files that Marranca told Bublitz that he did not possess any external hard drive containing Oilgear files.

50.    Forensic inspection revealed that there are 21 other USB storage devices that had, at some point, been connected to Marranca's Oilgear computer that were not surrendered and that, presumably, remain in Marranca's possession. Additionally, the unidentified Windows-based computer has not been surrendered to Oilgear's forensic analysts; and although Marranca has never disclosed or even hinted at its existence, it presumably remains in Marranca's or Tenet's possession.

**4.    Smith Recently Suggested that Oilgear Should Cede its Olmsted Business to Him**

51.    Following Tenet's successful recruitment of Marranca, Smith contacted Patrick Taylor ("Taylor"), the CEO of Oilgear and Texas Hydraulic Holdings, Inc. (Oilgear's parent corporation). Smith offered Taylor a most unusual business proposition: Smith would agree to terminate Olmsted's existing lease agreement for its facility in Traverse City, Michigan, in exchange for Oilgear assigning ownership of the Olmsted business to Smith—the same business that Smith had sold to Oilgear in 2008, and that he was already in the process of attempting to reconstitute through Tenet.

52.    Implicit in Smith's offer was the suggestion that Oilgear would not have a need for a facility in Traverse City; and, therefore, termination of the lease would constitute adequate consideration for Smith's assumption of the Olmsted business.

**C.    Marranca, Kline, and Insch Took Confidential Information**

53.    The information stored on Oilgear's internal network and copied or taken by Kline, Insch, and Marranca is not known to others outside of Oilgear and is not publicly available.

54.     Confidential information stored in Oilgear's internal computer systems is, in general, marked as "confidential" on the face of the documents themselves, or is otherwise known by those with access to confidential and proprietary business information.

55.     Oilgear uses physical security measures to safeguard its information, such as security access badges assigned to individuals with a need for access.

56.     Oilgear also uses electronic measures to secure its computer systems, including restricting access via password-protected individual accounts to those having legitimate business reasons to access the information.

57.     Oilgear also protects the confidentiality of it trade secrets and Confidential Information through internal policies and agreements imposing legal obligations on employees having access to such information. Insch and Smith were subject to written agreements prohibiting the disclosure of Oilgear's Confidential Information during and after their employment.

58.     Oilgear also publishes an employee handbook, stating:

As an employee, you will perform functions which may require the use of confidential and proprietary information ("Confidential Information"). (Confidential Information is any information of any kind, nature, or description concerning any matters affecting or relating to your work for The Oilgear Company, the business or operations of Oilgear, and/or the products, drawings, plans, processes, or other data of the company). Accordingly, to protect the Confidential Information, all employees must:

- Hold the Confidential Information received from Oilgear in strict confidence and shall exercise a reasonable degree of care to prevent disclosure to others.

- Not disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so in writing by Oilgear.

- Not reproduce the Confidential Information nor use this information commercially or for any purpose other than the performance of his/her duties for Oilgear.

- Upon the request by the Company or upon termination of his/her relationship with Oilgear, deliver to the company any

drawings, notes, documents, equipment, and materials received from Oilgear or originating from its activities for the company.

- Agree that Oilgear shall have the sole right to determine the treatment of any information that is part or project specific, including the right to keep the same as a trade secret, to use and disclose the same without prior patent applications, to file copyright registrations in its own name or to follow any other procedure as the company may deem appropriate.

59.     Marranca acknowledged receiving that handbook on February 27, 2015, by signing an acknowledgement that states: "I have received this handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

60.     Oilgear has gone to great expense to attempt to recover illicitly taken information by retaining counsel on both sides of the Atlantic to track down and obtain return of the information and by hiring computer forensic experts to determine what data has been copied, removed, altered or deleted from Company computers. the Company network and external storage devices.

61.     Unfortunately, the Defendants' takings have been so widespread, and the false, deceptive and misleading statements have been so brazenly made, that it is effectively impossible to ensure that Oilgear's Confidential Information and trade secrets are safe from Defendants' repeated efforts to misappropriate such information.

**D.      Tenet's Direct and Unfair Competition is Causing Irreparable Harms Oilgear's Business**

62.     On information and belief, Smith formed Tenet and unknown others with the goal of replicating the very same Olmsted valve business that Smith sold to Oilgear in 2008.

63.     While Tenet has no inherent legal obligation to refrain from competing against Oilgear or to refrain from hiring Oilgear's employees, Tenet faces substantial obstacles to becoming a formidable competitor of Oilgear if Tenet is limited to fair and lawful means. The capital investment,

development of intellectual property and the establishment of business goodwill are assets that Tenet cannot easily, inexpensively, or quickly re-create from scratch.

64.     Specifically, the crucial information that Tenet needs is Oilgear's internal engineering work product that has been developed (and acquired) at great expense over a period of time spanning decades, as well as the information related to present-day the requirements of Oilgear's customers, their past and planned purchases, service history, and pricing.

65.     When Smith sold Olmsted in 2008, he expressly acknowledged the existence and value of this Confidential information.

66.     Tenet does not, on information and belief, presently engage in the manufacture of Olmsted-style motion compensation valves. But with the detailed engineering drawings that Marranca misappropriated from Oilgear, Tenet could easily begin manufacturing efforts once they have secured adequate capitalization. Tenet's efforts to develop and manufacture its own line of competing Olmsted-style motion compensation systems will be accelerated by its free access to Oilgear's confidential and proprietary information.

67.     Because Tenet is not presently a manufacturer, it can only compete with Oilgear by offering services to Oilgear's customers—namely, the service and repair of Olmsted motion compensation valves already in use on deepwater oil platforms.

68.     As the world's preeminent manufacturer of motion compensation valves that have unmatched technical features possessed by no other competitor, Oilgear has a distinct advantage over its competitors in offering service and repair of the same equipment that it has sold to its own customers. Oilgear has all of the information necessary to repair and service its own valves. For example, if individual components fail in a valve, or need to be serviced, Oilgear possesses detailed and precise drawings that reflect the specifications and orientation of those components, down to hyper-technical details such as whether the smallest of parts must be lubricated and, if so, where. As

a result, almost half of Oilgear's motion compensation business is presently comprised of the service and repair side of the business.

69.     Because Tenet lacks Oilgear's self-developed and built-in competitive advantages, it has an incentive to steal as much of this information as it can from Oilgear.

70.     It is highly impracticable—if not impossible—for Tenet to provide the sophisticated repair and maintenance services required by Oilgear's motion compensation customers without also having access to Oilgear's confidential and proprietary drawings that contain precise product specifications and details.

71.     Notably, Oilgear is developing a highly proprietary new type of motion compensation technology. Marranca copied detailed drawings associated with this new technology on to the external hard drive that he connected to an unknown computer after leaving Oilgear. The drawings and specifications associated with this new technology possess incalculable value. The dissemination of these plans alone would cause irreparable damage to Oilgear.

72.     It is no coincidence that a significant number of engineering files are among the thousands of files Insch and Kline that copied and the *tens* of thousands of files Marranca copied as all three of them prepared to depart Oilgear to join Tenet.

73.     Tenet's purpose is not to develop new customers. Its purpose is to convert Oilgear's existing repair and service customers into Tenet's service and repair customers (and, presumably, also to develop the same equipment).

74.     It would be invaluable to Tenet, and would save Tenet enormous research and development expenses, to have records of what products each Oilgear customer has purchased, the precise specifications of those products, and the prices Oilgear's customers have paid for repair and service in the past. The service histories of each Oilgear customer enable salespersons to target those customers when they know specific work is due to be done. Many of the records that Marranca

downloaded the day before departing Oilgear reflect what future work Oilgear recommended for each customer, specific to each component.

75.     Oilgear will continue to suffer irreparable harm if competitors, such as Tenet, possess or utilize Oilgear's Confidential Information. The harm consists of lost customers, revenue, and customer goodwill. The Defendants' efforts will foreseeably result in the loss of Oilgear's ability to do business at a level justifying its Traverse City facility lease payment, which is presumably why Smith made the ominous "offer" to relieve Oilgear of those lease obligations in exchange for *giving him* the Olmsted business line.

76.     Tenet, through the efforts of Marranca, Kline, and Insch have knowledge of Oilgear's Confidential Information and the ability to exploit it, resulting in an unfair competitive advantage because the information has been acquired and used without paying fair consideration or incurring the time and expense of independent development.

77.     Notwithstanding Tenet's repeated assertions that it prohibits the misappropriation of Oilgear's Confidential Information, Tenet continues to hire Oilgear employees, and those employees continue to attempt to transfer massive amounts of data before they walk out the door.

78.     Rather than cutting ties with individuals shown to have improperly copied and taken information, as would be expected if Tenet was sincere in its claims of innocence, it has not done so. Quite the opposite—Tenet has offered substantially above-market compensation and benefit packages that dwarf what Oilgear is able to pay. Individuals such as Marranca and Insch, who have candidly described these offers as too good to decline.

79.     On information and belief, Tenet Hydraulics is overpaying its employees because of their ability to access and take the confidential Oilgear information. This is what makes these particular individuals more valuable to Tenet than others possessing the same or similar skills, but otherwise lacking access to valuable Confidential Information.

80.     Based on a repeated pattern of conduct, Tenet appears determined to continue with their plan to replicate the products and services developed at Oilgear using the misappropriated information as an unfair means to do so.

## FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets Under Defend Trade Secrets Act,
### 18 U.S.C. § 1836 *et seq.* and Michigan Uniform Trade Secrets Act, MCL § 445.1901 *et seq.*)

### (Against Tenet, Marranca, Smith, and Kline)

81.     Plaintiffs allege and incorporate by reference each of the allegations contained in paragraphs 1 through 80 above.

82.     A claim for misappropriation of trade secrets exists when (1) there is a trade secret, and (2) an actual or threatened misappropriation of the trade secret.

83.     "Trade secrets" include information, including a formula, pattern, compilation, device, method, technique or process, that derives independent value actual or potential, from not being generally known, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use, and is the subject of efforts that are reasonable under the circumstances, to maintain its secrecy.

84.     Oilgear's Confidential Information, including its engineering specifications and drawings, customer pricing data and formulas, service and repair procedural documents, customer agreements, and scopes of work are trade secrets protected under the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 *et seq.*, and Michigan's Uniform Trade Secrets Act, MCL § 445.1901 *et seq.*

85.     "Misappropriation" of a trade secret occurs either (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent who did one or more of the following: (a) used improper means to acquire knowledge of the trade secret,

(b) at the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or use, or (c) before a material change in his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

86.    During their prior employment with Oilgear, Kline, Insch, and Marranca had access to Oilgear's trade secrets.

87.    Oilgear's trade secrets are not generally known to, or readily ascertainable by, the general public or Oilgear's competitors.

88.    Oilgear derives economic value, actual and potential, from its trade secrets not being generally known to persons who could obtain economic value from their use.

89.    Oilgear's trade secrets have independent value, both actual and potential, from not being generally known, and not readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure and use.

90.    Oilgear undertook reasonable efforts to maintain the confidential nature of its trade secrets, including those described in the paragraphs above.

91.    The Oilgear's trade secrets relate to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

92.    Defendants misappropriated Oilgear's trade secrets by, among other things, copying engineering drawings, pricing information, customer details, and service and repair specifications onto portable storage devices, including an external hard drive, without Oilgear's knowledge, authorization or consent. Marranca and Tenet have misappropriated the trade secrets by using the same information

to unfairly perform Olmsted valve maintenance and repair services on behalf of current or former Oilgear customers.

93.     On information and belief, Marranca left Oilgear and purposefully retained every conceivable trade secret belonging to Olmsted. When confronted about this misappropriation, he lied to an Oilgear executive and claimed not to have any hard drive. But that same day, Marranca accessed and used Oilgear's trade secrets in furtherance of his efforts for Tenet.

94.     Similarly, Kline and Insch possessed external hard drive containing voluminous amounts of Oilgear trade secrets, including pricing data and formulas, engineering drawings, and customer quotes. While Kline provided that hard drive to Oilgear, and Insch purported to delete the Oilgear property off of his external hard drive, Oilgear alleges that Tenet, Kline and Insch nevertheless remain in possession of the data that was originally stored on both of those devices by virtue of their subsequent conduct.

95.     Based on information discovered thus far, each of the Defendants is using and will inevitably continue to use Oilgear's trade secret information as they target Oilgear's customers.

96.     Smith either personally engaged in the misappropriation of Oilgear trade secrets or should be held personally liable because Tenet is his mere instrumentality, Tenet was used by Smith to commit a wrong against Oilgear, and Oilgear suffered an unjust loss.

97.     As a result of the Defendants' misappropriation of Oilgear's trade secrets, and/or actual or threatened use or disclosure of such trade secrets, Oilgear has suffered and will continue to suffer irreparable harm, including but not limited to the loss of confidentiality of its Confidential Information, the loss of its advantageous competitive position in the hydraulic valve industry, the loss of customer relationships and goodwill and an immediate and continuing loss of revenue.

98.     Defendants' misappropriation is actionable under the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 et seq., and Michigan's Uniform Trade Secrets Act, MCL § 445.1901 et seq.

99.     As a direct and proximate result of Defendants' conduct, Oilgear has suffered actual damages in an amount to be determined at trial.

100.     Defendants' misappropriation was willful and malicious and made with the deliberate attempt to injure Oilgear's business and improve their own standing and business, thereby entitling Oilgear to an award of exemplary damages and attorneys' fees.

101.     Based on the foregoing, Oilgear prays that temporary and permanent injunctions be issued against Defendants in the form below, found in Oilgear's Prayer for Relief.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (Against Smith)

102.     Oilgear alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 101 above.

103.     Oilgear and Smith entered into a valid and enforceable agreement, the APA.

104.     Oilgear has complied with all of its material obligations under the APA.

105.     Smith breached Section 5.8 of the APA by failing to maintain Oilgear's Confidential Information in strict confidence and by using Oilgear's Confidential Information (as that term is defined by the APA) beyond the extent necessary to comply with the express terms of a written agreement between Oilgear and Smith. Smith's use of Oilgear's Confidential Information was manifested by his creation of Tenet and by his continued operation of Tenet in reliance on Oilgear's Confidential Information.

106.     Smith's breaches have directly, substantially, and irreparably harmed Oilgear.

107.     Oilgear has no adequate remedy at law for Smith's breach of the APA. Unless restrained, Smith's use and continued possession of Oilgear's Confidential Information will cause Oilgear serious and irreparable harm, both during the pendency of this action and thereafter.

108.     Oilgear prays that it recover actual damages based on Smith's breach of his contractual duties to Oilgear.

109.     Based on the foregoing, Oilgear prays that temporary and permanent injunctive relief be granted in the form described below in Oilgear's Prayer for Relief.

### THIRD CAUSE OF ACTION

**Breach of Covenant of Quiet Enjoyment**

**(By Olmsted Against Smith and SPI)**

110.     Olmsted alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 109 above.

111.     Olmsted is a tenant of the property the property at 1424 International Drive, Traverse City, Michigan, Unit 9, under a lease agreement with SPI, the landlord. SPI is an entity that is wholly owned, managed, and controlled by Smith.

112.     Olmsted has complied with all of its material obligations under the lease.

113.     Olmsted's right of quiet enjoyment of the premises, which is expressly provided for under the lease, has been breached by Smith and SPI.

114.     Smith and SPI have jointly acted in concert to obstruct, interfere with, or take away from Olmsted, to a substantial degree, the beneficial use of the Traverse City leasehold.

115.     The purpose of the lease, as was known to all parties at the time of its execution, is for Olmsted to operate and manage its motion compression valve business.

116.     Smith and SPI have interfered with Olmsted's beneficial use of the leasehold by: (1) using predatory tactics to solicit, recruit and hiring away Olmsted's employees to engage in a business in direct competition with Olmsted; (2) soliciting Olmsted's customers, and (3) using improper means to obtain confidential and proprietary information stored and maintained on the premises of Olmsted's Traverse City leasehold.

117.    The direct intention and effect of the actions of Smith and SPI is to substantially impair or eliminate Olmsted's capacity to continue doing business on the same premises to which it holds the lease.

118.    At all times, Smith has acted as the representative of SPI and SPI has sanctioned, directed, or is the source of authority by which Smith has interrupted Olmsted's enjoyment of the Traverse City leasehold. Thus, Smith is personally liable for his personal actions in breaching the Quiet Enjoyment provision, or SPI is an instrumentality of Smith that was used to commit a wrong on Smiths' behalf, causing Olmsted to suffer an unjust loss.

119.    The interference is evidenced by Smith's suggestion to Oilgear that it transfer the Olmsted business to Smith in exchange for termination of Olmsted's lease obligations.

120.    Smith's breaches have directly, substantially, and irreparably damaged Olmsted and Oilgear.

121.    Olmsted has no adequate remedy at law for Smith's and SPI's ongoing breach of its right of quiet enjoyment of the leasehold.

122.    Olmsted prays that it recover actual damages based on Smith's and SPI's breach of his contractual duties to Olmsted.

123.    Based on the foregoing, Olmsted prays that temporary and permanent injunctive relief be granted in the form described below in Olmsted Prayer for Relief.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Contract

### (Against Smith and Tenet)

124.    Plaintiffs allege and incorporate by reference each of the allegations contained in paragraphs 1 through 123 above.

125.    Plaintiffs were the intended beneficiaries of a valid and enforceable employment agreement with Insch, to wit the "Statement on Main Terms and Conditions of Employment" ("Employment Agreement") between Insch and Oilgear.

126.    Under this Employment Agreement, the "minimum period of notice to be given" by Insch was three months prior to terminating his employment. Insch was also obligated under the to refrain from disclosing the company's Confidential Information to "any customer of the company, information which may have come into [his] possession during [his] employment." Under the Employment Agreement, Insch also had an affirmative obligation to, upon termination of his employment, immediately return all Company property, including "correspondence, documents, specifications, papers and property belonging to the company" within his possession or control.

127.    Insch resigned his employment without providing three months' notice in breach of the Employment Agreement.

128.    Insch took Company property, rather than returning it, which was also a breach of the Employment Agreement.

129.    Upon information and belief, Insch also disclosed Company Confidential Information to Smith, Tenet, and/or others in violation of his Employment Agreement.

130.    Smith and Tenet had knowledge of Insch's contractual obligations as described in the paragraph above.

131.    Without justification, Smith and Tenet instigated and thereby caused Insch's contractual breaches. Smith either personally tortiously interfered as described above, or he used Tenet as his mere instrumentality to commit such wrongs, causing Oilgear to suffer losses.

132.    Oilgear has been damaged as a result of Insch's contractual breaches and the instigation of them by Smtih and Tenet.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Business Relations

### (Against Smith, Tenet, and Kline)

133.     Plaintiffs allege and incorporate by reference each of the allegations contained in paragraphs 1 through 132 above.

134.     Oilgear has valid business relationship and/or expectancies with its offshore drilling customers not necessarily predicated on enforceable contracts.

135.     Smith, Tenet, and Kline each have knowledge of Plaintiffs' relationships or expectancies.

136.     Smith, Tenet, and Kline each intentionally interfered with those relationships or expectancies by disrupting and impairing the relationships or expectancies.

137.     Smith either personally tortiously interfered as described above, or he used Tenet as his mere instrumentality to commit such wrongs, causing Oilgear to suffer losses.

138.     Plaintiffs have been damaged as a result of by Smith's, Tenet's, and Kline's intentional interference in their relationships or expectancies.

## FIFTH CAUSE OF ACTION

### Violation of Computer Fraud and Abuse Act (Against Marranca)

139.     Plaintiffs allege and incorporate by reference each of the allegations contained in paragraphs 1 through 138 above.

140.     During Marranca's employment, he was provided with access to a laptop computer and access to Plaintiffs' network servers, owned by Oilgear.

141.     Marranca was authorized to access the computer and the network servers exclusively for Marranca's legitimate use in carrying out his duties and responsibilities on behalf of Plaintiffs.

142.    The laptop and the network servers are "protected computers," within the meaning of the Computer Fraud and Abuse Act, 18 U.S. Code § 1030, *et seq*.

143.    All data stored on the laptop computer and the network servers was and is the exclusive property of Oilgear.

144.    Marranca, knowingly and without authorization, transmitted a program, information, code, or command to the laptop computer and the network servers, causing intentional damage to Oilgear's data that was previously stored on that computer.

145.    As a result of Marranca's unauthorized access to Oilgear's protected computers, Oilgear has sustained actual damages exceeding $5,000.00 in value.

<u>**SIXTH CAUSE OF ACTION**</u>

<u>**Civil Conspiracy (Against all Defendants)**</u>

146.    Plaintiffs allege and incorporates by reference each of the allegations contained in paragraphs 1 through 145 above.

147.    Defendants, in combination with each other, Insch, and unknown other persons, have undertaken concerted action to accomplish an unlawful purpose, or in the alternative, to accomplish a lawful purpose by unlawful means.

148.    The unlawful purposes include the taking and use of Oilgear's Confidential Information and trade secrets without authorization, the unauthorized access and harm to Oilgear's protected computers, and the tortious interference with Oilgear's contracts and business relations.

149.    The unlawful means used to accomplish the lawful purpose(s) including include the unauthorized taking of Oilgear's Confidential Information and trade secrets, tortiously interfering with Oilgear's contracts and business relations, and causing harm to Oilgear's protected computers, without authorization.

150.    The object of the conspiracy was agreed by Defendants.

151.    Each Defendant has taken affirmative steps in furtherance of the conspiracy.

152.    Plaintiffs have been damaged as a result of Defendants' conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  Defendants to be summoned to appear and answer;

2.  For preliminary and permanent injunctions ordering that Defendants and their respective agents, representatives, designees, and all persons in active concert or participation with them:

    a.      Be restrained from obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any of Oilgear's or Olmsted's confidential, proprietary, or trade secret information;

    b.      Be restrained from possessing any portable storage devices containing any Oilgear or Olmsted confidential, proprietary, or trade secret documents;

    c.      Be restrained from deleting, destroying, altering, or erasing any evidence related to this action, including but not limited to any hard or electronic copies of any information, documents, or data any former Oilgear employee copied, accessed, or took from Oilgear or Olmsted;

    d.      Within 2 days of the issuance of this Order, return to Oilgear all information, documents, and tangible things in Defendants' possession, custody, or control, whether in physical or digital format, including any and all copies thereof, that contain Oilgear's or Olmsted's Confidential Information; and

    e.      Within 2 days of the issuance of this Order, return to Oilgear any portable storage devices containing any Oilgear or Olmsted confidential, proprietary, or trade secret documents so that Oilgear may conduct an inspection of the device, preserve evidence on the devices for this litigation, and maintain the confidentiality of all Oilgear and Olmsted confidential, proprietary, or trade secret data on the device.

    f.      [Marranca and Kline] - Within 2 days, identify to Oilgear (by make, model, and serial number) all computing equipment to which either Marranca or Kline connected any storage device containing Oilgear or Olmsted data, from the date that they each respectively left Oilgear's employment.

    g.      After the return of all Oilgear and Olmsted materials pursuant to the above, Marranca, Smith, Kline, and Tenet shall provide a certification to Oilgear under penalty of perjury that each has returned and is not in possession – in electronic or hard copy form – of any confidential, proprietary, or trade

secret Oilgear or Olmsted documents or documents containing any confidential, proprietary, or trade secret Oilgear or Olmsted information. The certification shall confirm that each has reviewed all email accounts, cloud-based storage accounts, phones, tablets, computers, removable storage devices, back-up drives, hard copy files, and any other location in their possession, custody, or control where Oilgear or Olmsted data may be stored or maintained. The certifications shall be signed under penalty of perjury.

3.  Award Plaintiffs their actual damages, statutory damages and punitive damages in an amount to be determined at trial;

4.  Award Plaintiffs their attorneys' fees and costs in this matter;

5.  Award such other and further relief as the Court deems just and proper.;

6.  For pre- and post-judgment interest and costs of suit incurred herein; and

7.  For any other and further relief that the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Oilgear demands trial by jury on all claims and issues so triable.

---

Dated: July 1, 2019

Respectfully submitted,

*/s/  Hayley L. Berlin*

Hayley L. Berlin, Michigan Bar No. P75871

**PERKINS COIE LLP**
700 Thirteenth Street, N.W. Suite 600
Washington, DC 20005-3960
Telephone: (202) 654-6291
HBerlin@perkinscoie.com

Ann Marie Painter (Application for Admission
Forthcoming)
Texas State Bar No. 00784715
AMPainter@perkinscoie.com
Jason R. Elliott (Application for Admission
Forthcoming)
Texas State Bar No. 24050558
jelliott@perkinscoie.com

**PERKINS COIE LLP**
500 N. Akard, Suite 3300
Dallas, TX 75201
Telephone: (214) 965-7700

*Attorneys for Plaintiffs The Oilgear Company and Olmsted
Products Company LLC*